R. Scott Taylor, OSB No. 74324
542 Lawrence Street
Eugene, OR 97401
Ph: 541-485-1511 / fax: 541-246-2424
Scott@taylorinsurancelaw.com

Nick Gower, OSB No. 143274
319 SW Washington Street, Suite 614
Portland, Oregon 97204
Phone: (503) 507-3973
Fax: (503) 437-9170
Nick@gower.law

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| PETER S. BOGARD and WENDY V. BOGARD,<br><br>    Plaintiff,<br><br>    vs.<br><br>COUNTRY MUTUAL INSURANCE COMPANY,<br><br>    Defendant. | CASE NO.: 1:19-cv-00705-AA<br><br>PLAINTIFFS' SUPPLEMENTAL MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>ORAL ARGUMENT REQUESTED |

For sake of simplicity and flow, Plaintiffs' request the Court consider this briefing as a replacement to Plaintiffs' initial motion. This supplemental briefing removes Plaintiffs' arguments #2 and #3 contained in Plaintiffs' Motion for Partial Summary Judgment, which are

now moot following Defendant's Amended Answer & Affirmative Defenses.[1] This supplemental briefing incorporates the surviving argument in Plaintiffs' Motion for Partial Summary Judgement and includes two additional.

## INTRODUCTION

This case involves unique questions of law relating to the evolution of cannabis laws, specifically changes to the controlled substances act in the 2018 Farm Bill, and insurance policy exclusions related to the processing and manufacturing of controlled substances.

Plaintiffs suffered an accidental fire on or about January 6, 2019, which caused damage to an auxiliary private structure on the property. This fire occurred during the process of Plaintiff-Peter Bogard manufacturing CBD (cannabidiol) salve derived from industrial hemp. While Defendant answer admits Plaintiff-Peter Bogard was in the process of manufacturing CBD (cannabidiol) salve from industrial hemp, Defendant claims there is no coverage for the loss because:

> The Cannabis sativa L which plaintiffs were using to produce a CBD product at the time of the fire contained more than 0.3% total THC by dry weight making it marijuana under the Federal Controlled substances (sic) act (sic). At the time of the fire plaintiffs were manufacturing or processing a controlled substance.[2]

As written, Defendant's affirmative defense is insufficient as a matter of law. The Controlled Substances Act did not and does not contain a Total THC requirement. The determinative factor as to whether a cannabis plant is marijuana (a controlled substance) or hemp

---

[1] *Compare* Dkt. #21 *with* Dkt. #32.
[2] Dkt. #32 at 2-3.

(not a controlled substance) is whether the cannabis contained "a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."

Plaintiffs' cannabis contained not more than 0.3 percent delta-9 tetrahydrocannabinol. Accordingly, Plaintiffs' were not manufacturing or processing a controlled substance as defined by Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812.

## STATEMENT OF FACTS

*Background on THC & Decarboxylation*

There are more than a one-hundred cannabinoids that have been isolated and identified in cannabis.[3] The main psychoactive component in cannabis is delta-9 tetrahydrocannabinol (hereafter THC) – a neutral cannabinoid that does not occur at significant concentrations in the plant; however, can be formed by decarboxylation of its corresponding acidic cannabinoid, delta-9 tetrahydrocannabinol acid (hereafter THCA).[4] Decarboxylation occurs through exposure to light or heat (i.e. baking or smoking);[5] however, decarboxylation of THCA to THC is not a completely efficient conversion.[6] 60%-70% efficient decarboxylation of THCA to THC in a gas chromatography, in an analytical oven, or by smoking is considered acceptably accurate.[7]

---

[3] Exhibit 6 at 10 - Wang M, et al. Decarboxylation Study of Acidic Cannabinoids: A Novel Approach Using Ultra-High-Performance Supercritical Fluid Chromatography/Photodiode Array-Mass Spectrometry. Cannabis Cannabinoid Res. 2016;1(1).
[4] Exhibit 6 at 10 – Wang M, et al.
[5] Exhibit 6 at 10 – Wang M, et al.
[6] Exhibit 6 at 2 – Dr. Smith Expert Report.
[7] Exhibit 6 at 2 – Dr. Smith Expert Report.

*Plaintiffs' Hemp Activities and the Loss*

Plaintiffs were growing cannabis – specifically, industrial hemp and manufacturing industrial hemp products – under the 2014 Farm Bill's "Agricultural Pilot Program" for Industrial Hemp.[8] On or about January 7, 2019, Plaintiff-Peter Bogard was manufacturing CBD salve derived from cannabis in his detached garage.[9] During the process of making CBD salve, Plaintiff-Peter Bogard stepped away, took take a nap, and awoke to discover the CBD oil had caught fire in the garage.[10] The fire caused substantial damage to Plaintiffs' garage and the personal property contained therein (hereafter "the Loss").[11]

The source of cannabis for manufacturing the CBD oil came from two separate crops – the 2017 harvest and the 2018. First, the 2017 hemp crop was tested for compliance prior to being used. The 2017 hemp crop was tested by EVIO Labs on November 28, 2017.[12] The EVIO Labs report for the 2017 hemp crop found that the total THC was 0.381% by dry weight; however, the delta-9 tetrahydrocannabinol of the sampled material was "< LOQ," meaning the result for that cannabinoid was "below the limit of quantitation" with the limit of quantitation being 0.02000% on a dry weight basis.[13] The results of the EVIO Labs testing of the 2017 hemp crop were only valid until November 28, 2018.[14] The EVIO Labs testing arrived at a Total THC percentage by utilizing a 0.877 factor for decarboxylation of THCA to the delta-9 tetrahydrocannabinol.[15]

---

[8] *See* Exhibit 5.
[9] Dkt. #3 at ¶ 16.
[10] Peter Bogard Deposition Excerpts 43:14-22.
[11] Dkt. #3 at ¶ 10; Dkt. #32 at ¶ 1.
[12] *See* Exhibit 1 at 1.
[13] *See* Exhibit 1 at 1.
[14] *See* Exhibit 1 at 1.
[15] *See* Exhibit 1 at 1; Exhibit 6 at 2 – Dr. Smith Report.

Second, the 2018 hemp crop was tested for compliance prior to being used. The 2018 hemp crop was tested by EVIO Labs on May 4, 2018.[16] The EVIO Labs report for the 2018 hemp crop found that the total THC was 0.259% by dry weight; however, the delta-9 tetrahydrocannabinol of the sampled material was only 0.0365% on a dry weight basis.[17] The results of the EVIO Labs testing of the 2018 hemp crop were valid until May 3, 2019.[18] The EVIO Labs testing arrived at a Total THC percentage by utilizing a 0.877 factor for decarboxylation of THCA to the delta-9 tetrahydrocannabinol.[19]

Following the Loss, Plaintiffs promptly filed a claim with Defendant and Defendant investigated the claim.[20] Defendant summarily denied the claim on the basis of the Policy's Controlled Substances Exclusion.[21] The Policy's Controlled Substances exclusion states:

> **Exclusions – SECTIONS 2 through 6**
> **A.** "We" do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not there was widespread damage or affects a substantial area or the loss arises from natural, man-made, or external forces, or occurs as a result of any combination of these.[22]
> \*\*\*
> **17. Controlled Substance**
> Loss or damage arising out of the use, sale, delivery, transfer, possession, growing, production, processing, warehousing, transportation, or manufacturing, by any "insured" or with any "insured's" knowledge, of a controlled substance, as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812 (as amended),

---

[16] *See* Exhibit 2 at 1.
[17] *See* Exhibit 2 at 1.
[18] *See* Exhibit 2 at 1.
[19] *See* Exhibit 2 at 1.
[20] Dkt. #3 at ¶ 11, ¶ 14; Dkt. #32 at ¶ 1.
[21] *See* Exhibit 3.
[22] Exhibit 4 at 71.

regardless of whether the controlled substance is legal under any state law (for example: marijuana).[23]

*Material Changes to Controlled Substances Act*

Prior to December 20, 2018, notwithstanding the "Agricultural Pilot Program" for Industrial Hemp, the Controlled Substances Act made no distinction between marihuana (hereafter "marijuana") and hemp (hereafter "Prior CSA").[24] The Prior CSA considered marijuana and tetrahydrocannabinols as Schedule I controlled substances.[25] Notwithstanding the Prior CSA, industrial hemp could be grown pursuant to the "Agricultural Pilot Program."[26]

On December 20, 2018, with the passage of the Agricultural Improvement Act of 2018 (hereafter "2018 Farm Bill"), the Controlled Substances Act was immediately amended and created a distinction between marijuana and hemp (hereafter "Current CSA").[27] Hemp and tetrahydrocannabinols from hemp were explicitly removed from the Current CSA's schedule of controlled substances, with reference to the Agricultural Marketing Act of 1946's (amended by the 2018 Farm Bill) definition of hemp as:

> [T]he plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis.[28]

---

[23] Exhibit 4 at 85 (endorsement amending the Policy's Controlled Substances Exclusion).
[24] *See* 21 U.S.C. § 812 (2012)
[25] *See* 21 U.S.C. § 812, Schedule I (c) (2012).
[26] *See* 7 U.S.C. § 5940 (2014).
[27] Agriculture Improvement Act of 2018, Public Law No. 115-334, 132 Stat 4490 ("2018 Farm Bill"); 21 U.S.C. §§ 811-812.
[28] Agriculture Improvement Act of 2018, Public Law No. 115-334, 132 Stat 4490; 21 U.S.C. § 812; 21 U.S.C. § 802(16); 7 U.S.C. § 1639o.

## STANDARDS

Summary Judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must initially show the absence of a genuine issue of material fact.[29] The opposing party must then show a genuine issue of fact for trial.[30] A material fact is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party.[31] "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient."[32] "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor."[33]

## ARGUMENT

The Court should determine the Policy's Controlled Substances Exclusion does not apply to this Loss. First, Plaintiffs were not manufacturing or processing a controlled substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812 in effect at the time of the Loss. The Current CSA excludes hemp and tetrahydrocannabinols in hemp from the schedule of controlled substances. The Current CSA's differentiation of hemp from marijuana and differentiation of tetrahydrocannabinols in marijuana from tetrahydrocannabinols in hemp is based <u>solely on the percentage of delta-9 tetrahydrocannabinol</u> present on a dry weight basis.

---

[29] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[30] *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).
[31] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[32] *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).
[33] *Id*.

Plaintiffs' laboratory testing demonstrates that the source hemp contained not more than 0.3% delta-9 tetrahydrocannabinol on a dry weight basis.

Second, the Controlled Substances Act in effect at the time of the Loss contains no Total THC testing requirement. Interpretation of an insurance policy is limited to the four-corners of the document. Here, the insurance policy specifically references the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812, which also specifically references 7 U.S.C. § 1639o, for the purposes of defining what is a controlled substance; however, analysis of the statutes beyond the definitions contained therein is outside the four-corners of the Policy.

Third, even if the Court accepts Defendant's argument that at the time of the Loss the Controlled Substances Act differentiated marijuana from hemp on the basis of Total THC, the methodology employed by EVIO Labs to arrive at a Total THC for Plaintiffs' cannabis (using a 0.877 factor for decarboxylation of THCA to delta-9 tetrahydrocannabinol) is an unvalidated and arbitrary solution that does not function as an "other similar reliable method" for post-decarboxylation assessment of delta-9 tetrahydrocannabinol. At the time of the Loss, before USDA rules for testing were adopted, using a 0.52 to 0.613 factor for decarboxylation of THCA to delta-9 tetrahydrocannabinol, would have represented a similarly reliable method. Using such a methodology, Plaintiffs' cannabis contained not more than 0.3% Total THC on a dry weight basis and satisfied the testing requirements of 7 U.S.C. § 1639p.

1. **Plaintiffs' Source Cannabis Contained No More Than 0.3% Delta-9 Tetrahydrocannabinol**

Plaintiffs' 2017 harvest and 2018 harvest used at the time of the Loss were not controlled substances as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812.

The only controlled substances that Plaintiffs' 2017 harvest and 2018 harvest could potentially fall under are the Schedule I substances tetrahydrocannabinol or marijuana. In both instances, "hemp, as defined in section 1639o of title 7" is excluded from the Current CSA's list of controlled substances.[34]

Hemp is defined as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis."[35] The lab testing of both the 2017 harvest and the 2018 harvest show both harvests contained less than 0.3% delta-9 tetrahydrocannabinol on a dry weight basis.[36] Based on the lab tests, Plaintiffs were manufacturing or processing hemp, which is **not** a controlled substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812.[37] Accordingly, the Policy's Controlled Substances Exclusion is not applicable to Plaintiffs' Loss.

2. **There is No Total THC Requirement in the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812 and 7 U.S.C. § 1639o**

There is no Total THC requirement under the definitions under the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812, or the referenced definition of hemp under 7 U.S.C. § 1639o. These sections contain no specific testing requirements and make no reference to Total THC. At the time of the Loss, the Policy is unambiguous – if Plaintiffs' cannabis

---

[34] *See* 21 U.S.C. § 812, Schedule I (c)(17); *see also* 21 U.S.C. § 802(16)(B)(i).
[35] 7 U.S. Code § 1639o (1).
[36] *See* Exhibit 1 at 1; *see also* Exhibit 2 at 1.
[37] *See* 21 U.S.C. § 812, Schedule I (c)(17); *see also* 21 U.S.C. § 802(16)(B)(i).

contained less than 0.3% delta-9 tetrahydrocannabinol on a dry weight basis, then it is not a controlled substance as defined by the Policy.

The interpretation of an insurance policy is a matter of law.[38] The court's objective in construing an insurance contract is to determine the intent of the parties.[39] To determine the intent of the parties, the court uses a three-step process.[40] The first step is to examine the text of the policy to determine whether it is ambiguous, that is, whether it is susceptible to more than one plausible interpretation.[41] The court will apply any definitions that are supplied by the policy itself and will otherwise presume that words have their plain, ordinary meanings.[42] If a term has only one plausible interpretation, it is interpreted in accordance with that unambiguous meaning and the analysis ends.[43] If the wording of the policy is susceptible to more than one plausible interpretation, the court, engages in step two; examining the disputed terms in the context in which the phrase is used and in the context of the policy as a whole.[44] As a last resort, if any ambiguity remains after looking to the context of the policy, the court engages in step three; resolving the ambiguity by construing the term against the drafter—generally, the insurance company.[45] In the context of insurance contracts, courts determine plain meaning from the perspective of a reasonable insured.[46]

---

[38] *Emp'rs Ins. of Wausau v. Tektronix, Inc.*, 156 P.3d 105, 116 (Or. Ct. App. 2007).
[39] *Hoffman Constr. Co. of Alaska v. Fred S. James & Co.*, 836 P.2d 703, 706 (Or. 1992).
[40] *Id.* at 706-07.
[41] *Tualatin Valley Hous. v. Truck Ins. Exch*, 144 P.3d 991, 993 (Or. Ct. App. 2006).
[42] *Id.*
[43] *Andres v. Am. Standard Ins. Co.*, 134 P.3d 1061, 1063 (citing *Hoffman*, 836 P.2d at 706).
[44] *Id.*
[45] *Hoffman*, 836 P.2d at 706-07.
[46] *Id.*

Here, the Policy relies on the definitions of a controlled substance under the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. The Current CSA's schedule of controlled substances, references the Agricultural Marketing Act of 1946's (amended by the 2018 Farm Bill) for the definition of hemp – not a controlled substance under the Current CSA – which provides:

> [T]he plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis.[47]

The language is unambiguous. There is only one plausible interpretation. THCA and delta-9 tetrahydrocannabinol are different cannabinoids. The only cannabinoid identified to distinguish marijuana from hemp under the Current CSA is delta-9 tetrahydrocannabinol. While THCA can be decarboxylated from delta-9 tetrahydrocannabinol, THCA is not delta-9 tetrahydrocannabinol.[48] From the perspective of a reasonable insured utilizing the plain meaning of the terms, the threshold distinction between marijuana and hemp would be whether the cannabis contained not more than 0.3% delta-9 tetrahydrocannabinol – not whether the Total THC exceeded 0.3%.

Plaintiffs anticipate that Defendant will attempt to confuse the issues in its briefing by arguing that the requirement of not more than 0.3 percent delta-9 tetrahydrocannabinol concentration imposes a greater obligation than the actual text of the Current CSA. Specifically,

---

[47] Agriculture Improvement Act of 2018, Public Law No. 115-334, 132 Stat 4490; 21 U.S.C. § 812; 21 U.S.C. § 802(16); 7 U.S.C. § 1639o.
[48] *See* Exhibit 6.

the 2018 Farm Bill imposes a Total THC testing requirement for hemp producers by virtue of 7 U.S.C.§ 1639p, which mandates each State (or Tribal Territory) Department of Agriculture establish and submit a plan under which "the State or Indian tribe monitors and regulates that production."[49] The State (or Tribal Territory) plan must "include a procedure for testing, using post-decarboxylation or other similarly reliable methods, delta-9 tetrahydrocannabinol concentration levels of hemp produced in the State or territory of the Indian tribe."[50]

In support of the Total THC requirement, Defendant will likely point out the interim and final USDA's rules establishing what cannabis testing satisfies 7 U.S.C.§ 1639p's procedure for testing delta-9 tetrahydrocannabinol concentration levels using post-decarboxylation or other similarly reliable methods.[51] These USDA rules regarding Total THC testing requirements are irrelevant, because (1) the definitions under the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812 do not contain any specific testing requirements and make no reference to Total THC, (2) these USDA rules are a separate statutory scheme for the regulation of hemp production – a violation under the 2018 Hemp Program is not necessarily a violation under the Current CSA, and (3) any USDA rules regarding Total THC testing requirements did not exist at the time of the Loss.

---

[49] 7 U.S.C.§ 1639p.
[50] 7 U.S.C.§ 1639p.
[51] Interim Final Rule, 7 CFR Part 990, Federal Register, Vol. 84, No. 211, https://www.govinfo.gov/content/pkg/FR-2019-10-31/pdf/2019-23749.pdf (effective October 31, 2019); Final Rule, 7 CFR 990, Federal Register, Vol. 86, No. 11, https://www.govinfo.gov/content/pkg/FR-2021-01-19/pdf/2021-00967.pdf (effective March 22, 2019);

### 3. The EVIO Labs Test Use of a 0.877 Factor for Decarboxylation of THCA to THC is Not A Similarly Reliable Method to Testing Cannabis Post-Decarboxylation

If the Court is not persuaded by the above analysis, and determines at the time of the Loss the Current CSA required Plaintiffs' cannabis meet a threshold of no more than 0.3% Total THC, there remains the question of the proper methodology to arrive at a Total THC percentage.

The EVIO Labs test, using liquid chromatography, separately analyzes the neutral cannabinoids (i.e, delta-9 tetrahydrocannabinol) and the acidic cannabinoids (i.e., THCA).[52] No decarboxylation is necessary using this technique.[53] To arrive at a theoretical amount of delta-9 tetrahydrocannabinol that would exist post-decarboxylation, the EVIO Labs test utilizes a formula which uses a factor of 0.877 for decarboxylation of THCA to delta-9 tetrahydrocannabinol:

**Formula Using 0.877 Factor[54]**

(THCA * 0.877) + delta-9 THC = Total THC

**Formula Using 0.877 Factor Applied to EVIO Labs Test[55]**

(0.435 * 0.877) + 0 = 0.381 Total THC (% by dry weight)

The methodology employed by EVIO Labs to arrive at a Total THC for Plaintiffs' cannabis (using a 0.877 factor for decarboxylation of THCA to delta-9 tetrahydrocannabinol) is an

---

[52] See Exhibit 1 at 1; see also Exhibit 6 at 10 - Wang, et al..
[53] Exhibit 6 at 10 - Wang, et al..
[54] Exhibit 1 at 1.
[55] *See* Exhibit 1 at 1.

unvalidated and arbitrary solution that does not function as an "other similar reliable method" for post-decarboxylation assessment of delta-9 tetrahydrocannabinol.[56]

At the time of the Loss, before USDA rules for testing were adopted, using a 0.52 to 0.613 factor for decarboxylation of THCA to delta-9 tetrahydrocannabinol, would have represented a similarly reliable method.[57] Using such a methodology, even using the higher end of the 0.613 factor for decarboxylation, Plaintiffs' cannabis would have contained no greater than 0.3% Total THC on a dry weight basis and satisfied the testing requirements of 7 U.S.C.§ 1639p – as they could be reasonably interpreted at the time of the Loss.

**Formula Using 0.613 Factor Applied to EVIO Labs Test**

$$(0.435 * 0.613) + 0 = 0.2666655 \text{ Total THC (\% by dry weight)}$$

Utilization of a factor of 0.52 to 0.613, representing a representing 60-70% efficiency of conversion of THCA to delta-9 tetrahydrocannabinol, would result in Plaintiff's' cannabis containing not more than 0.3% Total THC.

Regardless, EVIO Labs utilization of the 0.877 factor for decarboxylation of THCA to delta-9 tetrahydrocannabinol and Defendant's reliance on the EVIO Labs testing to deny its insureds coverage under a controlled substances exclusion, assumes perfectly efficient, 100% conversion of THCA to delta-9 tetrahydrocannabinol post-decarboxylation —which is not feasible, either by analytical laboratory analysis or by user consumption of the material.[58] Hence,

---

[56] Exhibit 6 at 1-3 – Dr. Smith Expert Report.
[57] *See* Exhibit 6 at 2 – Dr. Smith Expert Report.
[58] Exhibit 6 at 1-3 – Dr. Smith Expert Report.

the 0.877 factor is not suitable as an "other similarly reliable method" for post-decarboxylation determination of delta-9 tetrahydrocannabinol.[59] Accordingly, if the Court determines the differentiation between cannabis as a controlled substance at the time of the Loss required analysis of Total THC using post-decarboxylation or other similarly reliable methods, (1) Plaintiffs' cannabis contained no more than 0.3% Total THC using a proper factor for post-decarboxylation, or (2) Defendant's reliance on EVIO Labs Total THC is misplaced due to utilization of a 0.877 factor for decarboxylation and a question of fact remains as to the Total THC of Plaintiffs' cannabis at the time of the Loss.

## CONCLUSION

For the aforementioned reasons, the Policy's Controlled Substances Exclusion is not applicable. The Court should grant Plaintiffs' Motion for Partial Summary Judgment on coverage and proceed to resolving Plaintiffs' damages.

DATED: March 31, 2021

                                                  **GOWER LAW LLC**

                                                  s/ **Nick Gower**

                                                  _____
                                                  **Nick Gower**, OSB #143274
                                                  nick@gower.law
                                                  Associated Counsel for Plaintiffs

---

[59] Exhibit 6 at 2 – Dr. Smith Expert Report.

# CERTIFICATE OF SERVICE

The undersigned certifies that on the below date, a true and correct copy of the foregoing

PLAINTIFFS' SUPPLEMENTAL MOTION FOR PARTIAL SUMMARY JUDGMENT

by facsimile, first class mail, and/or deposit into the CM/ECF system on the following:

    Country Mutual Insurance Company

By and through Defendant's counsel:

    Bernard S. Moore, OSB # 843051
    Frohnmayer, Deatherage, Jamieson, Moore, Armosino & McGovern, P.C.
    2592 East Barnett Road
    Medford, Oregon 97504-8345
    Fax: 541-779-6379

DATED: March 31, 2021

                                                  **GOWER LAW LLC**

                                                  s/ **Nick Gower**
                                                  _____
                                                  **Nick Gower**, OSB #143274
                                                  nick@gower.law
                                                  Associated Counsel for Plaintiffs