R. Scott Taylor, OSB No. 74324
542 Lawrence Street
Eugene, OR 97401
Ph: 541-485-1511 / fax: 541-246-2424
Scott@taylorinsurancelaw.com

Nick Gower, OSB No. 143274
319 SW Washington Street, Suite 614
Portland, Oregon 97204
Phone: (503) 507-3973
Fax: (503) 437-9170
Nick@gower.law

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| PETER S. BOGARD and WENDY V. BOGARD, | CASE NO.: 1:19-cv-00705-AA |
| Plaintiff, | PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| vs. | ORAL ARGUMENT REQUESTED |
| COUNTRY MUTUAL INSURANCE COMPANY, | |
| Defendant. | |

**RESPONSE**

This is a case involving first-party insurance benefits under a contract of adhesion. The

question before the Court is whether the Policy's Controlled Substances Exclusion applies to the

Bogards' Loss. This question necessitates an interpretation of the Policy's Controlled Substances Exclusion, which explicitly defines and narrows the scope of what a controlled substance is to those definitions at the Federal Food and Drug Law at 21 U.S.C.A. Section 811 and 812 (as amended).

Country's Motion directs the Court to look beyond the Federal Food and Drug Law at 21 U.S.C.A. Section 811 and 812 (as amended) and look at the evolving nature of cannabis law as it stands today; however, the Bogards' loss did not occur today. The Bogards' loss occurred *before* the USDA's Interim Rule regarding testing requirements, *before* Oregon's Administrative Rules regarding testing, and *before* the USDA's Final Rule regarding testing requirements. These rules are neither informative nor instructive to the applicability of the Controlled Substances Exclusion at the time of the Loss.

This case necessitates that the Court unwind time to the date of the Loss on or about January 16, 2019. The Bogards' loss occurred during a gap in time where no ordinary purchaser of insurance would believe they were violating the Controlled Substances Exclusion of the Policy. Here, the Policy unambiguously provides coverage for the Bogards' Loss based on the plain language of the Policy and the Bogards' cannabis testing at no more than 0.3% delta-9 THC. Country has failed to meet its burden of proof that the Policy's Controlled Substances Exclusion applies.

At a minimum, the Policy was ambiguous at the time of the Loss as to: (1) whether the dispositive factor as to whether cannabis is marijuana (a controlled substance) or hemp (an uncontrolled substance) was a delta-9 THC content of no more than 0.3% **OR** a Total THC of no

more than 0.3%, and (2) if a Total THC content is the dispositive factor, what were "similarly reliable methods" to decarboxylation for cannabis testing. Any and all ambiguities between these interpretations should be resolved in the Bogards' favor.

## STANDARDS

**Interpretation of an Insurance Policy**

"The interpretation of an insurance policy is an issue of law" for the court.[1] In interpreting a provision in an insurance policy, Oregon courts employ a three-step process first articulated in *Hoffman*.[2] The overriding goal in construing an insurance policy is to "ascertain the intention of the parties."[3] Courts "determine the intention of the parties by analyzing the policy's express terms and conditions."[4] Courts "interpret the terms of an insurance policy according to what [they] perceive to be the understanding of the ordinary purchaser of insurance."[5] Courts "construe the text of the policy as a whole, rather than view particular parts of the policy in isolation."[6]

---

[1] *Hunters Ridge Condo. Ass'n v. Sherwood Crossing, LLC*, 285 Or App 416, 422 (2017) (*citing Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Oregon*, 313 Or 464, 469 (1992)); *Farmers Ins. Co. of Oregon v. Munson*, 145 Or App 512, 519–20 (1996), *rev den*, 325 Or 368 (1997).

[2] *Coos Cnty. Airport Dist. v. Special Districts Ins. Servs. Tr. of Special Districts Ass'n of Oregon*, 291 Or App 829, 834 (2018) (*citing Hoffman Constr. Co. of Alaska*, 313 Or at 469–71).

[3] *Dewsnup v. Farmers Ins. Co. of Oregon*, 349 Or 33, 39–40 (2010) (internal quotation marks omitted).

[4] *Hunters Ridge Condo. Ass'n*, 285 Or App at 422 (*citing Hoffman Constr. Co. of Alaska*, 313 Or at 469).

[5] *Congdon v. Berg*, 256 Or App 73, 87 (2013) (*quoting Totten v. New York Life Ins. Co.*, 298 Or 765, 771 (1985)). *See also* ORS 42.250 ("[t]he terms of a writing are presumed to have been used in their primary and general acceptation").

[6] *Bresee Homes, Inc. v. Farmers Ins. Exch.*, 353 Or 112, 122 (2012).

"If an insurance policy explicitly defines a disputed term, then [the courts] apply that definition."[7] But if the policy does not define the term at issue, the court "turn[s] to various aids of interpretation, first considering whether the term has a plain meaning, because it 'is susceptible to only one plausible interpretation.'"[8]

The Court's three-step analytical framework for this inquiry consists of:

(1) If the term has only one plausible interpretation, courts apply that interpretation and conduct no further analysis.

(2) If a phrase has more than one plausible meaning, courts will examine the particular context in which the term is used within the policy and the broader context of the policy as a whole.

(3) If two or more plausible interpretations remain after all other methods of resolving the dispute are exhausted, only then will Oregon courts construe the ambiguous term against the drafter, that is, the insurer.[9]

**ARGUMENT**

**1. Interpretation of Insurance Policy Limited to Four Corners**

Interpretation of an insurance policy is limited to the four corners of the policy and terms are to be interpreted according to the understanding of an ordinary purchaser of insurance. Here, the Policy explicitly relies on the definitions of controlled substances as set forth at the Federal Food and Drug Law at 21 U.S.C.A. Section 811 and 812 (as amended), so these definitions are

---

[7] *Coelsch v. State Farm Fire & Cas. Co.*, 298 Or App 207, 211 (2019) (*citing Groshong v. Mut. of Enumclaw Ins. Co.*, 329 Or 303, 307–08 (1999)). *See also Holloway v. Republic Indem. Co. of Am.*, 341 Or 642, 650 (2006).

[8] *Coelsch*, 298 Or App at 211 (*quoting Groshong*, 329 Or at 308)..

[9] *Hoffman Constr. Co. of Alaska*, 313 Or at 469–71,

included in the four corners of the document. However, the Policy's Controlled Substances Exclusion makes no further references to other specific laws, statutes, or administrative rules.

If the Court's analysis is limited to the four-corners of the Policy, there is no ambiguity. The Bogards were not in violation of the Policy's Controlled Substances Exclusion because their cannabis product tested at less than 0.3% delta-9 THC on a dry weight basis consistent with the plain language of the Federal Food and Drug Law at 21 U.S.C.A. Section 811 and 812 (as amended).

Alternatively, there are two ambiguities that should be resolved in the Bogards' favor. First, there is an ambiguity as to whether the Controlled Substances Exclusion incorporates the language of the 2018 Farm Bill's Hemp Program provisions that the State (or Tribal Territory) plan must "include a procedure for testing, using post-decarboxylation or other similarly reliable methods, delta-9 tetrahydrocannabinol concentration levels of hemp produced in the State or territory of the Indian tribe."[10] If so, a Total THC of no more than 0.3% would be the dispositive factor between marijuana and hemp.

There remains an ambiguity, even if the Court believes that the Policy unambiguously incorporates the 2018 Farm Bill Hemp Program provisions and those provisions implicitly modify or clarify the distinction between hemp and marijuana under the Federal Food and Drug Law at 21 U.S.C.A. Section 811 and 812 (as amended). At the time of the Loss, there were no specific requirements as to what type of testing methods would satisfy the testing requirements

---

[10] 7 U.S.C.§ 1639p.

for "decarboxylation or similarly reliable methods." The Bogards' expert, Anthony Smith, succinctly explains why the 0.877 factor EVIO Labs applied is not a similarly reliable method to decarboxylation. Using the similarly reliable method proposed by Anthony Smith, the Bogards' cannabis testing results for Total THC would have been under 0.3%.

> ### a. There was No Ambiguity at the Time of the Loss – the Percent of Delta-9 THC is the Only Determining Factor Between Hemp and Marijuana in the Federal Food and Drug Law at 21 U.S.C.A. Section 811 and 812 (as amended)

The Bogards were not engaged in any activities involving a controlled substance as defined by the Federal Food and Drug Law at 21 U.S.C.A. Section 811 and 812 because the cannabis product tested at no more than 0.3% delta-9 THC.

The only Policy provision at issue in the parties' summary judgment briefing is the Policy's Controlled Substances Exclusion (amended by endorsement), which provides:

> **Exclusions – SECTIONS 2 through 6**
> **A.** "We" do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not there was widespread damage or affects a substantial area or the loss arises from natural, man-made, or external forces, or occurs as a result of any combination of these.[11]
> \*\*\*
> **17. Controlled Substance**
> Loss or damage arising out of the use, sale, delivery, transfer, possession, growing, production, processing, warehousing, transportation, or manufacturing, by any "insured" or with any "insured's" knowledge, of a controlled substance, as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812 (as amended),

---

[11] Dkt. #37-4 at 71.

regardless of whether the controlled substance is legal under any state law (for example: marijuana).[12]

The Federal Food and Drug Law at 21 U.S.C.A. Sections 812 only creates a distinction between hemp and marijuana based on the amount of delta-9 THC, specifically hemp contains no more than 0.3% delta-9 THC and marijuana contains 0.3% or more delta-9 THC.

The Federal Food and Drug Law at 21 U.S.C.A. Sections 812 (as amended) provides the following relevant provisions:

Schedule I
***
**(c)** Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:[13]
***
**(10)** Marihuana[14]
***
**(17)** Tetrahydrocannabinols, except for tetrahydrocannabinols in hemp (as defined under section 1639o of title 7).[15]

Marihuana is defined as:

(A) Subject to subparagraph (B), the term "marihuana" means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or

---

[12] Exhibit 4 at 85. The Bogards' Amended Complaint and Country's summary judgment briefing cite to the Policy's Controlled Substances Exclusion *prior to* amendment by endorsement. *See* Dkt. #3 at 3 ¶ 15; *see also* Dkt. #35 at 2.
[13] 21 U.S. Code § 812 Schedule 1(c).
[14] 21 U.S. Code § 812 Schedule 1(c)(10).
[15] 21 U.S. Code § 812 Schedule 1(c)(17).

preparation of such plant, its seeds or resin. (B) The term "marihuana" does not include— (i) hemp, as defined in section 1639o of title 7; or (ii) the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.[16]

The term hemp is defined as:

[T]he plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis.[17]

It is undisputed that THCA is a biological precursor to delta-9 THC by way of decarboxylation (i.e., heat); however, THCA and delta-9 THC are separate and distinct cannabinoids that can be separately tested for.[18] Here, the Bogards' cannabis test was liquid chromatography that separately reported the delta-9 THC and THCA.[19]

The Federal Food and Drug Law at 21 U.S.C.A. Section 812 only defines hemp as cannabis containing no more than 0.3% delta-9 THC. The Federal Food and Drug Law at 21 U.S.C.A. Section 812 does not mention, indicate, or suggest that THCA or Total THC is a consideration or differentiating factor between marijuana (a controlled substance) and hemp (an

---

[16] 21 U.S.C § 802(16) (definitions for subchapter).
[17] 7 U.S.C. § 1639o (cited by 21 U.S.C. § 812 and 21 U.S.C § 802(16) (definitions for subchapter))
[18] *See* Dkt. #35-4 at 1-2.
[19] Dkt. #34-4 at 2-3

uncontrolled substance) under the Federal Food and Drug Law at 21 U.S.C.A. Section 812. The

plaining meaning of "no more than 0.3% delta-9 THC" has only one plausible meaning: the

difference between hemp (an uncontrolled substance) and marijuana (a controlled substance)

hinges on the percentage of delta-9 THC, not THCA, and not Total THC.

It is undisputed that the Bogards' cannabis product used at the time of the Loss tested at no

more than 0.3% delta-9 THC. It is undisputed that THCA is a separate cannabinoid from delta-9

THC.[20] Accordingly, by the plain language of the Policy, the Bogards' were not engaging in

activities with a controlled substance at the time of the loss, "as defined by the Federal Food and

Drug Law at 21 U.S.C.A. Sections 811 and 812 (as amended)," and the Policy's Controlled

Substances Exclusion does not apply as a matter of law.

> ### b. Alternatively, There Were Two Plausible Interpretations of the Distinction Between Hemp and Marijuana Under the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812 (Total THC of Not Greater Than 0.3% OR Delta-9 THC of Not Greater Than 0.3%)

At a minimum, at the time of the Loss there was an ambiguity as to whether cannabis

containing a Total THC of equal to or greater than 0.3% was a controlled substance as defined by

the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812 **OR** whether cannabis

containing a delta-9 THC of equal to or greater than 0.3% was a controlled substance as defined

by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. If the Court

---

[20] *See* Dkt. #35-4 at 1.

The only support for Country's argument regarding a Total THC distinction, that existed <u>at the time of the Loss</u>, is beyond the four corners of the Policy. Country directs the Court to review the 2018 Farm Bill's Hemp Program provisions, specifically that State, Tribal, or USDA Plans shall include "a procedure for testing post-decarboxylation or other similarly reliable methods." This language leads Country to conclude that cannabis containing equal to or greater than 0.3% Total THC is marijuana (a controlled substance). The Bogards believe Country's maneuver changes the explicit and plain meaning of the definition of hemp "as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812."

If the Court agrees with Country that State, Tribal, or USDA plans requirement to include "a procedure for testing post-decarboxylation or other similarly reliable methods" unambiguously requires the consideration of Total THC in distinguishing hemp from marijuana – despite not being included or referenced in the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812 – there still remains an ambiguity as to what testing standards satisfied the "other similarly reliable methods to decarboxylation" described in the 2018 Farm Bill Hemp Program provisions.

### a. The EVIO Labs Test Use of a 0.877 Factor for Decarboxylation of THCA to THC is Not A Similarly Reliable Method to Testing Cannabis Post-Decarboxylation

The Bogards' incorporate their summary judgement argument on this issue as if fully set forth in this Response.[21] The most Country can reasonably argue is the 2018 Farm Bill's Hemp

---

[21] *See* Dkt. #36 at 13-15.

Program provisions required that State, Tribal, or USDA Plans shall include "a procedure for testing post-decarboxylation or other similarly reliable methods." The precise nature of what constitutes "other similarly reliable methods" does not exist in the 2018 Farm Bill and no agency rules (interim or final) were issued interpreting these provisions until October 31, 2019 with the enactment of the USDA's Interim Rule.

Plaintiffs' expert, Dr. Anthony Smith explains, that the use of a 0.877 factor was not a similarly reliable method to decarboxylation because it assumes perfectly efficient, 100% conversion of THCA to delta-9 tetrahydrocannabinol post-decarboxylation —which is not feasible, either by analytical laboratory analysis or by user consumption of the material.[22] Effectively, the use of a 0.877 factor overestimates the value of potential THC in the subject cannabis.

Dr. Smith created his opinion based on the status of cannabis law as it stood at the time of the Loss on January 16, 2019.[23] At that time, in his expert opinion, the use of a 0.877 factor was not required by the 2018 Farm Bill and was not a similarly reliable method to post-decarboxylation testing.[24]

In contrast, Country's expert relies on conclusions of law and conclusory statements that:

> The "other similarly reliable method" referred to in the 2018 Farm Bill is the use of an accepted mathematical formula which calculates the amount of Delta-9 THC that would be produced if the given amount of THCA was subject to decarboxylation. ***

---

[22] Dkt. #37-6 at 1-3.
[23] *See* Declaration of Nickolaus Gower, Anthony Smith Deposition Excerpts 8:21-9:9.
[24] Dkt. #37-6 at 1-3.

> The Total THC value of 0.381% represents the total amount of Delta-9 THC in the sample by dry weight after accounting for the conversion of THCA to delta-9 THC post-decarboxylation, as required by the 2018 Farm Bill.

First, Country's expert ignores the language of the 2018 Farm Bill Hemp Program provisions. By its very language the 2018 Farm Bill's Hemp Program envisions that there are multiple methods for testing cannabis product that would be similarly reliable to post-decarboxylation testing.[25]

Jason Wilson claimed during deposition that his opinions and conclusions were derived from analyzing the Bogards' cannabis test at it applies to "the literal written word of those rules and laws," yet admits the literal written word of the 2018 Farm Bill did not actually include the 0.877 factor for decarboxylation of THCA to delta-9 THC – it is not included in the 2018 Farm Bill.[26]

At a minimum, at the time of the Loss there were two plausible interpretations of what testing methods satisfied the 2018 Farm Bill Hemp Program provisions "other similarly reliable methods" to decarboxylation. One using a 0.877 factor and the other using a factor between 0.526 to 0.613. Further, evaluation of the context of the Policy does not help resolve the ambiguity. Accordingly, the Policy's Controlled Substances Exclusion is not appliciable.

      *b.* ***The 2018 Farm Bill's Hemp Program provisions, USDA Agency Rules, and Oregon Administrative Rules are Irrelevant to the Court's Analysis***

---

[25] Take note of the plural in "testing post-decarboxylation or other similarly reliable methods."
[26] *See* Declaration of Nickolaus Gower, Jason Wilson Deposition Excerpts 13:2-12, 20:2-14.

Country's motion relies heavily on 2018 Farm Bill's Hemp Program provisions, USDA agency rules, and Oregon Administrative Rules that are beyond the four-corners of the document and not informative to the expectations of the Bogards at the time of the Loss. Had Country expected the Bogards to be subject to the requirements of a broader regulatory scheme for coverage under the Policy, Country could have used language to broaden the exclusion. Instead, the Policy only excludes loss involving controlled substances "as **defined** by the Federal Food and Drug Law at 21 U.S.C.A. Section 811 and 812" (emphasis added).

First, neither the 2018 Farm Bill's Hemp Program provisions, USDA Rules, nor Oregon Administrative Rules concerning testing requirements under the 2018 Hemp Program implicitly or explicitly modify or interpret the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Each of these concerns the monitoring and regulation of hemp production, not the schedule of controlled substances. The Bogards were not on notice that coverage under the Policy was subject to the rules monitoring and regulating hemp production, as opposed to the schedule of controlled substances in the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812.

Second, the USDA Interim Rule,[27] the OARs for hemp testing[28], and the USDA Final Rule[29] were not in effect – or even proposed – at the time of the Loss. The Bogards were not on

---

[27] Interim Final Rule, 7 CFR Part 990, Federal Register, Vol. 84, No. 211, https://www.govinfo.gov/content/pkg/FR-2019-10-31/pdf/2019-23749.pdf (effective October 31, 2019)
[28] DOA 12-2019, Permanent Rules for Hemp, OAR 603-048-0010 (05/15/2019).
[29] Final Rule, 7 CFR 990, Federal Register, Vol. 86, No. 11, https://www.govinfo.gov/content/pkg/FR-2021-01-19/pdf/2021-00967.pdf (effective March 22, 2021);

notice that coverage under the Policy was subject to the requirements of rules that did not exist and were not incorporated into the Policy.

Country cites to testing requirements under OAR 333-064-0100(61). Testing requirements for hemp and recreational marijuana are the same pursuant to state law; however, the Oregon Department of Agriculture is charged via statute with administering the State's hemp program for studying the growth, cultivation and marketing of industrial hemp.[30] Similar to the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812, the Oregon Department of Agriculture's OARs regarding growing, handling, retail sales, and testing of industrial hemp did not define or address Total THC at the time of the Loss. Only a*fter* the Bogards' Loss did the Oregon Department of Agriculture's OARs identify and define Total THC.[31] Regardless, the OARs are not relevant to the applicability of the Policy's Controlled Substances Exclusion which defines a controlled substance in accordance with the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812.

---

[30] See ORS 571.263. (The Department of Agriculture: "(1) Shall administer ORS 571.260 to 571.348; (2) Shall adopt by rule any record keeping and reporting requirements necessary to administer the program; (3) May purchase, possess, seize or dispose of industrial hemp products or commodities as the department deems necessary to enforce and ensure compliance with ORS 571.260 to 571.348 or department rules relating to ORS 571.260 to 571.348; and (4) May exercise any other power or perform any other function necessary to administer the program").
[31] *Compare* DOA 7-2019, Temporary Rules for Hemp, OAR 603-048-0010 (03/01/2019) *with* DOA 12-2019, Permanent Rules for Hemp, OAR 603-048-0010 (05/15/2019).

## 2. *State v. Robinson* is Neither Persuasive Nor Instructive

While *State v. Robertson* seems to address *similar* issues, the *Robertson* opinion is starkly at odds with this case. Defendant's analysis and reliance on *Robertson* intentionally omits the operative facts and reason for decision.

While *Robinson* did involve discussion regarding THC and THCA in the context of evolving cannabis laws, the decision is distinguished from the present matter in several significant respects.

First, *Robertson* is an unpublished appellate opinion concerning the interpretation of dueling legislation in the State of Washington in the context of a criminal appeal.[32] In contrast, this case involves a civil claimant alleging breach of contract under an insurance Policy requesting the Court to interpret that Policy and determine the applicability of the Policy's Controlled Substances Exclusion as a matter of law.

Second, the *Robertson* court involved "dueling legislation" that were each in effect at the time of the defendant's conviction – EHB 2056 and SSB 5416.[33] The *Robertson* court determine:

> The Washington Legislature passed EHB 2056, effective May 1, 2013, for the express purpose of amending the definition of THC concentration to permit inclusion of acid. The legislature declared its purpose as "correcting the definition of THC concentration as adopted by Initiative Measure No. 502 to avoid an implication that conversion, by combustion, of tetrahydrocannabinol acid into delta-9 tetrahydrocannabinol is not part of the THC content that differentiates marijuana from hemp." The legislature considered

---

[32] *State v. Robertson*, No. 34411-8-III, 2017 Wash. App. LEXIS 2601, (Ct App Nov. 16, 2017).
[33] *State v. Robertson*, No. 34411-8-III, 2017 Wash. App. LEXIS 2601, at *22 (Ct App Nov. 16, 2017).

the amendment critical such that it declared the legislation an emergency.

SSB 5416, adopted fifteen days later, omitted the correcting definition of THC concentration, but the legislature intended SSB 5416 to only address electronic prescription of drugs. SSB 5416 failed to note the amendment to the definition of THC caused by EHB 2056, because the later bill did not include the language of the earlier bill and place a strike through "or the combined percent of delta-9 tetrahydrocannabinol and tetrahydrocannabinolic acid in any part of the plant Cannabis regardless of moisture content," the method employed by the legislature when it intends to remove language from a statute. In the frequent rush of legislative business, the legislature erred.[34]

Ultimately, the *Robertson* court determined that a Washington State statute addressed the precise issue in interpreting dueling statutes, RCW 1.12.025. The *Robertson* court determined that the language of EHB 2056 controls the prosecution the defendant. The language of EHB 2056 provided:

"THC concentration" means percent of delta-9 tetrahydrocannabinol content per dry weight of any part of the plant *Cannabis*, or per volume or weight of marijuana product*, or the combined percent of delta-9 tetrahydrocannabinol and tetrahydrocannabinolic acid in any part of the plant Cannabis regardless of moisture content.*[35]

---

[34] *State v. Robertson*, No. 34411-8-III, 2017 Wash. App. LEXIS 2601, at *23-24 (Ct App Nov. 16, 2017).
[35] *State v. Robertson*, No. 34411-8-III, 2017 Wash. App. LEXIS 2601, at *17-18 (Ct App Nov. 16, 2017) (*citing* EHB 2056).

Finally, the *Robertson*'s dispute over competing legislation (one of which included THCA and delta-9 THC specifically and the other which only included THC and not THCA) is not comparable to this situation involving one piece of legislation "the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812" which only mentions delta-9 THC and makes no mention of THCA. Defendant misconstrued the *Robertson* ruling and omitted crucial facts in an attempt to force a comparison to this case.

If anything, the *Robertson* holding's reliance on a statute that specifically identified THCA in the definition of "THC Concentration," supports Plaintiffs' insistence that a failure to identify THCA specifically in "the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812" defeats Defendant's claim that Plaintiffs' Loss was Excluded by the Policy's Controlled Substances Exclusion.

## CONCLUSION

For the aforementioned reasons, the Policy's Controlled Substances Exclusion is not applicable. The Court should deny Defendant's Motion for Partial Summary Judgment on coverage and proceed to resolving Plaintiffs' damages.

DATED: April 21, 2021

**GOWER LAW LLC**

 s/ **Nick Gower**

_____
**Nick Gower**, OSB #143274
nick@gower.law
Associated Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the below date, a true and correct copy of the foregoing

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

by facsimile, first class mail, and/or deposit into the CM/ECF system on the following:

    Country Mutual Insurance Company

By and through Defendant's counsel:

    Bernard S. Moore, OSB # 843051
    Frohnmayer, Deatherage, Jamieson, Moore, Armosino & McGovern, P.C.
    2592 East Barnett Road
    Medford, Oregon 97504-8345
    Fax: 541-779-6379

DATED: April 21, 2021

                              **GOWER LAW LLC**

                               s/ **Nick Gower**
                              _____
                              **Nick Gower**, OSB #143274
                              nick@gower.law
                              Associated Counsel for Plaintiffs